**Pages 1 - 60**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| VS. | )      NO. CR 16-07396 EMC ) |
| ROGER JINTEH ARRIGO CHEN and GENIA TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) ) |
| Defendants. | ) ) ) |

San Francisco, California
Thursday, June 8, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

             BAKER BOTTS LLP
             One Shell Plaza
             910 Louisiana
             Houston, Texas  77002
        BY: **PAUL R. MORICO, ATTORNEY AT LAW**
             **ELIZABETH L. FLANNERY, ATTORNEY AT LAW**

             BAKER BOTTS LLP
             101 California Street - Suite 3600
             San Francisco, California  94111
        BY: **STUART C. PLUNKETT, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:       Lydia Zinn, CSR No. 9223, RPR, FCRR
                   Official Reporter
Transcribed by:    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:
                        WILMER, CUTLER, PICKERING, HALE
                           & DORR LLP
                        7 World Trade Center
                        New York, New York 10007
                BY:     **ROBERT J. GUNTHER JR., ATTORNEY AT LAW**

                        WILMER, CUTLER, PICKERING, HALE
                           & DORR LLP
                        1225 17th Street - Suite 2600
                        Denver, Colorado 80202
                BY:     **NORA Q.E. PASSAMANECK, ATTORNEY AT LAW**

Also Present:           **Rita Hao, University of California**
                        **Suja Subramaniam, Genia Technologies**
                        **Byron Allen, Genia Technologies**

**Thursday - June 8, 2017**                                   **3:04 p.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Court resumed please.  Remain seated.  Please be seated.

Calling case C 16-7396, The Regents of the University of California versus Chen.

Counsel, please come to the podium and say your name for the record.

**MR. MORICO:**  Paul Morico, Your Honor, with the law firm of Baker Botts, the Houston office, on behalf of the plaintiff, The Regents of the University of California.

**THE COURT:**  All right.  Thank you.

**MR. PLUNKETT:**  Stuart Plunkett of Baker Botts, also on behalf of The Regents of the University of California.

**THE COURT:**  All right.  Good afternoon.

**MS. FLANNERY:**  Elizabeth Flannery also on behalf of The Regents of the University of California.

**THE COURT:**  All right.  Thank you, Ms. Flannery.

**MR. MORICO:**  And also, Your Honor, if you might indulge me, we have here in the courtroom Ms. Rita Hao, who is the client with the University of California.

**THE COURT:**  Great.  Thank you.

**MR. GUNTHER:**  Good afternoon, Your Honor.  Bob Gunther, from the WilmerHale law firm for defendants

Roger Chen and Genia Technologies, Inc.

**THE COURT:**  All right.  Welcome to you.

**MS. PASSAMANECK:**  Nora Passamaneck, the law firm of WilmerHale, also for defendants Genia Technologies, Inc., and Roger Chen.

**THE COURT:**  All right.  Thank you.

**MR. GUNTHER:**  I'm sorry, Your Honor.  I should just quickly introduce in the back row -- or the front row Suja Subramaniam and Byron Allen, both from in-house at Genia.

**THE COURT:**  Great.  Thank you and welcome, everybody.

So let me get to what I think is the core issue that we have to address, and that is the statute of limitations question.

And in looking at the Exhibit B -- let me get my device here to work properly -- to the motion to dismiss, which has the cascading illustrations of the Genia patents, there are five patents.

And it seems to me that the law is pretty clear now that, at least upon publication, that there's at least constructive notices for statute of limitations purposes.

So even if you didn't know about a patent, where it's certainly a patent in your field, on a subject matter that's, you know, reasonably related, that the publication constitutes constructive notice.

And so I don't think there's much debate that the '604,

which was published in August of '11 and issued in December of '12, is outside the limitations period.

**MR. PLUNKETT:** Your Honor, I will agree that of all of the statute of limitations issue raised in the papers, that that is the most challenging for the plaintiffs; but I don't agree that the law is established that publication of that patent application is constructive notice.

I would like to bring -- I would like to say that the entire line of cases that holds that emanates from the Ninth Circuit decision in *General Bedding*; and *General Bedding* was, itself, a summary judgment case. In *General Bedding*, the Ninth Circuit said that constructive notice is typically a fact question.

Cases that followed *General Bedding* in the Ninth Circuit, including the *Wang* case which defendants rely on, added factual issues to the question of constructive notice. In *Wang*, the judge said that there is constructive notice but only if you're practicing in the same field, which, obviously, is inherently a factual question.

In this case, the question is factually difficult because we're talking about a public university that has thousands of researchers and former researchers, and to say that a public university should be on constructive notice of all patents that relate to the -- potentially relate to the research of so many researchers and former researchers seems unfair but it also

certainly seems like a fact question.

This argument was made forcefully in the reply brief.  We think that the defendants have overstated the law of constructive knowledge, and we wanted to bring to Your Honor's attention your decision in *Garcia versus Coleman*.

(Pause in proceedings.)

**MR. PLUNKETT:**  Pardon me.

I have the case in front of me.  The cite is 2008 Westlaw 4166854.  It's Your Honor's decision from 2008 and it's a summary judgment case.  You denied summary judgment on the issue of constructive notice.  It was a trademark case.  And Your Honor said, with respect to a trademark -- knowledge of a trademark in the USPTO (reading):

"We have found no case suggesting the existence of public records precludes the application of the delayed discovery doctrine as a matter of law.  While public records certainly impart presumptive notice under some circumstances, we decline to hold their mere existence imparts knowledge as a matter of law."

**THE COURT:**  But patent systems is a little different from trademark systems.  I mean, there's a lot more to it.

And let me ask.  Are you contending that the University and its work with respect to the matters at hand here were not practicing in the same field as Mr. Chen and Genia and in -- with the '604 and related patents?

**MR. PLUNKETT:** Well, I don't agree. I do not believe there's any relevant difference between patent and trademark law with respect to constructive notice. I think the equities there and the considerations would be exactly the same.

The University is not a practicing entity. It's a public research institution so the University -- to say that the University --

**THE COURT:** So you mean this doctrine only applies to actually those who practice the invention and not those who research and prosecute patents?

**MR. PLUNKETT:** I may have misspoken. What I was saying is that in one case following *General Bedding*, one judge, Judge Alsup in the *Wang case*, decided that constructive knowledge would only apply if the plaintiff were practicing -- if it were found that the plaintiff were practicing in the same field.

**THE COURT:** Right. So given the narrowing construction you say that Judge Alsup placed on *General Bedding* and *Wang*, why doesn't this case meet even a narrowing construction? It is practicing the same field; isn't it?

**MR. PLUNKETT:** Well, I do not think that the University -- it should be held that the -- the result of that type of a holding would be that the University would be held to have constructive knowledge as a matter of law without any discovery with respect to any patent application that's filed

that touches on research work done by any researcher or any former researcher at the University across the state.  That would be thousands of people.  To impose that kind of an obligation on a public research institution does not comport with the directive of *Wang*.

And let me put *Wang* in context.  That is not the only case that has been decided post-*General Bedding*.  There have been other cases that do not follow that rule.

And most of the cases that defendants site, there was discovery and the issue of statute of limitations was decided on the factual record.

**THE COURT:**  So what information -- assuming we take the theoretical construct that *Wang* has set forth, which has the requirement, as you read it, as practicing in the same field, what other facts, other than the nature, which is I think undisputed -- what the nature of Mr. Chen's research while at UCSC was; the nature of what he allegedly, you know, invented or coinvented; or the subject matter and the nature of the Genia patents -- what other facts would we consider?

**MR. PLUNKETT:**  Well, the most important point on the statute of limitations in this case is the application of equitable estoppel.

With regard to constructive notice, if they were to win the constructive notice argument, that could potentially knock out the '914 patent, but all of the claims related to the Genia

patents must be considered under the rubric of equitable estoppel.

And we have -- and let me go to their reply brief.

So what equitable estoppel says is, when you're aware of your claim and then the defendant takes some type of action to cause you to forbear bringing it.

**THE COURT:** I'm still working on constructive notice.

**MR. PLUNKETT:** Okay.

**THE COURT:** Well, let me give you a chance to respond, at least with respect to the '914.

**MR. GUNTHER:** Yes, Your Honor.

So with respect to the '914, we think the law is clear. And these cases do come up and sometimes they come up in the summary judgment context, sometimes they come up -- like the *Klang* case that we cited and a couple of others that we cited in our briefs -- come up in the motion to dismiss context.

But, Your Honor, the whole theory of their case, as pled in the Amended Complaint, starting with paragraph -- really paragraph 2 where they talk about what the USCS -- sorry -- UCSC inventions are, they talk about them being proprietary technologies relating to computer chips containing an array of individually addressable nanopores, which is used in characterizing a nucleic acid sequence. That's right at the outset of their Complaint.

And then, Your Honor, the whole notion of this Complaint

is their contention that Mr. Chen, who later went on to cofound Genia, made these inventions -- certain of these inventions while he was -- relating to nanopore technology while he was working in the nanopore technology laboratory at the University of California Santa Cruz.

And now -- so the notion that there is any type of fact-finding, this is -- this is sort of the interesting case, Your Honor, where you can look at their Amended Complaint and look at what they're alleging, and the very allegations show that what they're talking about is the same field in both aspects and the same -- you know, the same technology.

THE COURT:  It's alleged that the Genia patents were, quote, "derived from the UCSC inventions."

MR. GUNTHER:  That's right.  That's right.  So it seems to me, Your Honor, you know, there may be other things that we have to talk about; but notice under the *General Bedding* cases has been interpreted.  And, you know, Judge Alsup had a bit of a winding road to get there as we talk about in the briefing; but the fact of the matter is, Your Honor, I don't think there's any -- on that specific point, I don't think there's any facts that aren't alleged in the Complaint.

I mean, you know --

THE COURT:  Is there any subsequent circuit authority embellishing or elucidating *General Bedding*?

MR. GUNTHER:  Your Honor, I think that -- we looked

and I think most of the cases that we found are Northern District cases, and I am not aware --

THE COURT: That's as good as circuit authority.

MR. GUNTHER: It's actually not bad.

No, seriously, Your Honor, I think *General Bedding* seems to be the case that really speaks most directly to this issue.

THE COURT: Have other circuits opined? I'm just curious.

MR. GUNTHER: Yeah, I don't know that -- I'm not sure that other circuits have opined. There have been some District Court cases and there were some cases that were cited in the Eastern District of Texas. I think there's a Southern District of New York or maybe Eastern District of New York case that's cited.

But I think those cases are distinguishable factually, Your Honor, and I don't think -- you know, I don't think -- again, to your specific question with respect to the first patent that issued as the '914 patent, I don't think any of those cases really are directly on point.

THE COURT: Well, let's timing some of it. Let me go on to what I think is the hard question, and that is whether the continuation patents fall under that notion that, well, if you sort of sleep on your rights on the first one, everything that follows, even those within the limitations period, will sort of get pulled in to that vacuum there, which is, you know,

as a starting point, a bit contrary to the normal notion that each patent is a -- and the *Stark* case -- that each patent is a new thing, you know, et cetera, et cetera.

**MR. GUNTHER:**  Right.

**THE COURT:**  Now, I understand that *Stark* was predicated at least in part upon the fact that patent applications were not public and there wasn't knowledge, and the *Stanford* case is one that we need to look at fairly carefully.

And I could see why you would want to rely on the *Stanford* case because there there were -- the limitations bar was openly held to apply to subsequently filed, not to mention granted, filed patents --

**MR. GUNTHER:**  Right.  Right.

**THE COURT:**   -- within the limitations period, but there there was pretty good notice.  I mean, *Stanford* in its presentation stated that the continuations -- the presentation states that continuations based on the same application pending remained pending and offered a license for further patents that may issue.

So there are pretty clear bases to say, well, it was kind of out that there was going to be current and future patents flowing from this.

And, indeed, the court said that Roche had explicit notice that Stanford intended to secure additional patents to the same

subject matter; and, therefore, sort of constructive -- it was fair to imply that constructive knowledge sort of forward and pull all the other ones back.

What's the -- here it's not quite as explicit. I mean, Mr. Chen went off and got this thing and filed it, and then there were continuation patents but there was no -- I don't recall any express statement that, you know, there was more coming, et cetera, et cetera. They didn't offer a license, that kind of thing.

MR. GUNTHER: Right.

THE COURT: So there does seem to be a distinction. So this would be an extension of *Stanford* it seems to me.

MR. GUNTHER: Your Honor, I think -- I think it's interesting because I'm -- *Stanford* is clearly an actual notice case as opposed to a constructive notice case.

THE COURT: Yeah.

MR. GUNTHER: And you're right, in the *Stanford* case there was the statement: "Hey, you know, we have this one patent. We've applied for others."

What I would say, I mean, because all of these cases kind of come up with an interesting factual -- you know, their own factual circumstances -- and I'm sticking now, Your Honor, with what's been alleged in the Complaint and assuming the truth of those allegations -- and what I would say here is that you look at the constructive notice with respect to the publication and

issuance of the '604 patent.  And then, Your Honor, the law requires -- and we talk about this in our briefs -- but the law requires that if you're going to do a continuation patent and try to get later claims, everything -- the invention has to be described and it has to be in the first application.

So, yes, people write claims, patent lawyers write claims, but in order for it to get priority back to that first one, that first application, it necessarily -- all of the inventions have to be disclosed and enabled and described in that first application.

And so, you know, we look at cases.  We've looked at some cases where -- and, you know, outside of this circuit, where the courts have sort of given separate dates to separate patents.  Most often, that occurs when there are differences in the specification.  So there are continuation-in-part patents as opposed to straight continuation patents.

So my first point is that -- I have three points.  The first one is:

The continuation patent brings everything along, because all of the inventions must by definition be --

THE COURT:  So you would say that there's almost a *per se* constructive notice rule if you really meet the definition of continuing patent?

MR. GUNTHER:  That's exactly right.

THE COURT:  Regardless of actual notice or not,

regardless of presentations and offers of licenses, are there any cases that take *Stanford* to that?

**MR. GUNTHER:**  That take it quite that far on that point by itself?

**THE COURT:**  Yes.

**MR. GUNTHER:**  No.  I will concede to you.

But, Your Honor, here's the other two -- my other two points.  And part of what constructive notice is about and looks to -- and this goes back to the *General Bedding* case -- is:  Does that patent give you a notice as a potential plaintiff that there is a claim, that there's some type of claim; and does it give you a duty to investigate them?

And what I would say, Your Honor, is this:  That if you take a look at the second application, the first -- the first -- it was the first continuation application that was filed on September 15, 2012.  That's the second one in the cascade.

**THE COURT:**  For the '854 patent?

**MR. GUNTHER:**  Yes.  That actually issues as the '854 patent.

Now, Your Honor, the fact of the matter is -- and this goes to this key question of duty to investigate as a result of the constructive notice -- our position is that the patent -- the publication and issuance of the first patent put the University of California on constructive notice and gave it --

and gave a duty to inquire at that point.

And, Your Honor, the interesting thing about this is:  Had they gone to the patent office and asked -- and they could have done this online -- they would have been able to find out because it's no longer secret.  Once the patent, the underlying patent, has been published and issued, continuation patents are open.

So they could have found out, had they inquired, which they did not, that the second patent, a straight continuation had been filed on September 15th, 2012, which is outside the limitations period.

THE COURT:  How easily is that indexed if you knew only of the '914?

MR. GUNTHER:  Yes.

THE COURT:  Is there some kind of program that gives you an alert when a continuation patent is filed?  What do you have to do?

MR. GUNTHER:  I think, Your Honor -- and I think this was true in 2012 -- you probably -- you had to add -- you had to put it into the database.  So basically say -- you know, essentially do a query to see whether or not any continuations had been filed off of the original patent.

THE COURT:  Can you ask a specific -- can you query a specific question as to whether there are any continuing patents off of the '914 or the yield?  Is there something --

**MR. GUNTHER:**  My understanding is -- my understanding is you can; right?  And --

**THE COURT:**  Can or can't?

**MR. GUNTHER:**  You can.  You can.  Okay?

And now -- and then -- and so part of our point is first patent issues, constructive notice.  Duty to inquire attaches at that point.  They could have found out there was a continuation pending had they done the most rudimentary work.

My third point --

**THE COURT:**  Let me ask you on the rudimentary, would they have to do this something like every week?  Is there a way to do an alarm within the system?

**MR. GUNTHER:**  No, no.  That's a great question, Your Honor.

They could -- once the -- once the -- you cannot file a continuation on an application once the first patent -- once the first patent issues.  You have to have a continuation on file before that.

So if you look at the bottom -- the issue date of the first patent, the '914, it issued on December 4, 2012.  So one of the things you know is that if there's going to be a continuation, or a continuation-in-part, or something that's related to that first application, in order to keep the chain alive, you've got to file something before that patent issues.

So they would -- again, 2012 is outside the limitation

period.  And what anybody -- any sort of reasonable person in this area, somebody who was in the technology office would know is that if they're going to find a continuation application, it would have to be filed before that date.

**THE COURT:**  So why isn't that a fact question? Normally constructive notice or not is a fact question.

It sounds like a lot of things we've been talking about: How do you query it?  How often -- how hard is it to find? What kind of notice -- inquiry notice?  How strong was that inquiry notice?

Why isn't that sort of a fact-based question that you could prevail on ultimately if you show how easy it is, how related it is, how active they are in the fields?

But seems like constructive notice -- or if you call it inquiry notice, combined, whatever -- it sounds like a potentially fact-based question with respect to the continuation.

**MR. GUNTHER:**  Yeah.  Yeah.  I hear you, Your Honor.

Listen, I think -- what I would say is that I think that it is a matter of essentially public record.  Now, we haven't -- I haven't given you this.  I'll concede that I have not given the Court what the public record is in terms of what could have been -- how it would have been done prior to December of 2012.

But, Your Honor, I don't think it's so much of a fact

issue.  It's just a matter of what -- you know, what, as a matter of public record, could be done at that point; and I think that's something that we could -- if Your Honor were interested, I'd be happy to supplement on that point.

     And I don't think its something -- I honestly don't think its something that would create a fact issue; and -- because I think, you know, there's a very specific way that this was done.

          THE COURT:  Is there -- what about the legal standard to determine how much -- how strong a factual basis there is in order to meet the constructive notice sort of threshold?  Is it something that should have known, you know, reasonable inquiry; or it had to have been gross negligence not to?

     You know, what standard is there?  It's obviously clear in the *Stanford case*, you know, you didn't have to argue much. They basically told them.

          MR. GUNTHER:  Yeah.  Right.  Right.

          THE COURT:  But without that and you've got stuff out there, once we get the facts, it's a difficult record, we understand how the database works and everything, how -- what's the -- is there any elucidation in the case law about, well, if you're going to apply constructive notice to subsequent continuation patents, what the level of *scienter*, or whatever it is, needs to be?

          MR. GUNTHER:  Yeah.  I think, Your Honor, I'm not sure

the cases address that directly.  I will tell you -- so, for example, in the *General Bedding* case, the interesting sort of thing about that case is that it actually came out the other way from, you know, the position I would be taking here; and the reason being was, that while the patent was found to provide notice, the question then became did it -- did it give a duty to inquire.

And since the inventor who was named on the patent was not the person who had worked previously for the plaintiff, the court found that, that even had they inquired, that would not have sent them down the road of finding out that the plaintiff had actually been behind this.

**THE COURT:**  Uh-huh.

**MR. GUNTHER:**  What I take from that, Your Honor -- and this is my -- I'll be very candid with you.  This is my sort of gloss on looking at having looked at a lot of these cases in preparing the motion and getting ready for the argument.  I feel like it moves toward a reasonable inquiry standard.

And, again, can I point you to a case that says that flat-out?  No, but I think that's sort of the gestalt that I get from reading the cases.

And that leads me to my third point, Your Honor, which I don't want to miss, which is, as alleged in the Complaint -- and this is paragraph 41 and 42 of the Amended Complaint -- there's allegations that on multiple occasions, in 2009 and in

2010 outside the limitations period, the University went to Mr. Chen, and asked him to sign declarations with respect to patent applications that had been filed in 2008 shortly before -- well, actually after he had left.  He left in January 2008.  So they go to him on multiple occasions.

THE COURT:  What was it they wanted him -- what was the -- what did the declarations say?

MR. GUNTHER:  Those declarations, as I understand it, were, you know, sort of standard inventor declarations --

THE COURT:  Yeah.

MR. GUNTHER:  -- and essentially the kind of things that you typically will have the various inventors sign as part of the patent application process.

THE COURT:  Yeah.

MR. GUNTHER:  And so they go to him multiple times.  And, again, this is their allegations in paragraph 42.  They say he had failed to respond.  They say he was evasive, but they don't spell out anything like that.

And then they -- and this is, I think, very important.  On one occasion in connection with an inactive University patent application -- and it's inactive, Your Honor, because they filed subsequent continuation applications off of that.  So I mean, obviously, even though that application is inactive, the applications that are at issue now in this case are straight continuations of these type of earlier applications.

But the point is that he says during a telephone conversation with the University's outside counsel, Matthew Kaiser, indicating he would not sign the declaration in connection with the application.  Now they make a big deal of at that time; right?

But the point is, Your Honor, again, outside the limitations period they have the -- they have an inventor telling them that he's not going to sign; right?

And so my point in bringing that up is that, as we look at -- you know, again, take a reasonable inquiry standard. Multiple occasions he says, *I'm not signing this app* -- *I'm not going to sign.*  The patent issues -- the first patent issues and gives constructive notice.

And then, Your Honor, at least as -- and, again, this is the point we've discussed before in terms of, you know, does it raise a fact issue.  I think not.

But, you know, could they have found out about the filing of the second application?  I think --

**THE COURT:**  So the combination of his noncooperation, refusal to execute a declaration, plus constructive notice of the application and the publication of what came to be the '914 --

**MR. GUNTHER:**  Yes.

**THE COURT:**  -- should have raised enough suspicion to say, *Well, we'd better start putting out a running inquiry or*

*something*?

**MR. GUNTHER:**  *Let's do a search and see if he filed a continuation.*

And, Your Honor, I will say this, too.  And, look, I'm going outside the pleadings to say this, but having practiced in this field for quite a while, the notion of filing continuation applications is commonplace.  It's almost always done.  In fact, I would -- I would go so far as to say that in any kind of important patent application, not filing a continuation is something that would raise eyebrows.

**THE COURT:**  Well, not that I'm allowed to ask, I mean, industry practice, depending on what happens --

**MR. GUNTHER:**  Yeah.

**THE COURT:**  -- but this, again, sort of underscores --

**MR. GUNTHER:**  Listen, I'm outside the Complaint, Your Honor.  I totally get it.

**THE COURT:**  Right.  Right.  But it does logically -- one would logically think that might inform whether there's a duty of inquiry or constructive notice, which maybe the other side is the point of raising an inquiry --

**MR. GUNTHER:**  Right.

**THE COURT:**  -- but it does speak to why it is, at least in the first instance, a fact question.

And it may be that at summary judgment all of the facts will line up so powerfully -- given this, this, and this --

industry practice, you get some expert testimony here, or whatever --

**MR. GUNTHER:**  Right.

**THE COURT:**  -- but at this stage, and especially just with this, and the law uncertain as to the quantum of evidence or degree of *scienter*, and a lot of facts which we're now talking about are outside of the record --

**MR. GUNTHER:**  Yeah.

**THE COURT:**  -- it sounds to me like that part of it may be a fact question, constructive notice of the continuation patents.

**MR. GUNTHER:**  Right.  Right.  Right.

**THE COURT:**  You probably don't disagree with that.

**MR. PLUNKETT:**  I don't want to step on my own --

**THE COURT:**  Smart lawyer.

**MR. PLUNKETT:**  Yeah.  I have responses to a few things that were said.

**THE COURT:**  Yep.  Yep.

**MR. PLUNKETT:**  I'll just make a few points.

First of all, to the extent the early request that the University made for Mr. Chen to sign a document related to those now-abandoned patent applications.  Under the doctrine of continuous accrual, the only way those communications would be relevant is if they amounted to a repudiation of his contract because then the claim would have accrued at that time.

And I believe that defendants understand this to be the case because in a footnote at the very end of their reply brief they say (reading):

"In any event, there was a repudiation of the contract."

But defendants know there was no repudiation of the contract because there was communication between Mr. Chen and Mr. Chen's counsel and the University through 2016 where no one was saying the contract was repudiated. Instead, there were requests for additional information, and there were other assertions that are completely inconsistent.

THE COURT: Well, I thought Mr. Gunther's point was more of whether or not there was inquiry notice given sort of the suspicious circumstances -- this, quote, "questionable behavior of Mr. Chen" -- then combined with the fact that he actually did apply and that became public in 2011, that that gave the University sufficient notice that they should have anticipated the four other continuation patents.

MR. PLUNKETT: Well, I understand that point but that's not related to any claim.

Claims with respect to the Genia patents could not have -- none of the elements would have evolved to the point where the University had a claim until each Genia patent was filed.

With respect to the breach of contract --

THE COURT: Well, the same could be said in *Stanford*.

I mean, there was no claim for some of those later patents, but it was held bar -- limitations bar.  And maybe you see this as unfairly punitive, but if you don't act early and you know other stuff is coming, even though the other stuff didn't happen, you couldn't quite have sued back then, the fact that you didn't sue earlier kind of forfeits your later right to claim the related stuff even though they hadn't even existed. There was no cause of action at the time.

MR. PLUNKETT:  That is not what happened in *Stanford*. As Your Honor pointed out, in *Stanford* the reason that continuation patents were barred was because of that presentation.  The accrual date in *Stanford* had nothing to do with when any application was filed or published or issued.  It had to do with a presentation that was made.

The only patent -- then the court -- there was one sentence at the very end of the decision where the court says, *Okay.  There's one patent where you would have had notice* -- and that was one of the trial patents -- *but that was because it published outside of the limitations period*.

*Stanford* is totally irrelevant.  It is -- and it is the only authority -- literally the only case defendants have in their attempt --

THE COURT:  I wouldn't say it's totally irrelevant. I'd say it's not dispositive.

MR. PLUNKETT:  It's only relevant --

THE COURT:  It's kind of a building block that doesn't get the defendant to where he wants to go, but I wouldn't say it's irrelevant.

MR. PLUNKETT:  In our view it's purely an actual notice case, so *Stanford* will become relevant when there are -- there's a factual record and there can be an argument about actual notice.

THE COURT:  Do you think there can be such a thing as constructive notice of continuation patents even though those continuation patents hadn't even become public until you're within the limitations period?

MR. PLUNKETT:  Could there be constructive notice of a continuation patent?

THE COURT:  So as to bar actions based on continuation patents, even those in the limitations period.

MR. PLUNKETT:  I don't think any case has held that. I haven't seen any authority for that proposition.  And that's why *Stanford* -- this actual notice case with this short, clipped discussion -- is being propped up in an attempt to get rid of a claim, claims that are clearly accrued within the statutory period.

And nor, as I said, do we concede on the '914 patent, because we don't see any law that should cause this Court to apply a rule as a matter of law to the University in giving constructive notice and barring it from making claims.

But as I alluded to earlier, the equitable estoppel issue, which we have pled in detail -- and I can point the Court to those passages in the Complaint -- applies to every single claim and every single patent.

And under our alleged equitable estoppel tolling, the claims accrued -- all of the claims for all of the patents accrued at the latest in February 2016 where there was a communication alleged in the Complaint that arguably -- maybe it happened later in 2016, but in February 2016 there was a letter that arguably put it into the discussion about whether Mr. Chen would comply with his obligations.

**THE COURT:**  Well, your equitable estoppel argument is that the University was induced in to forbearing suit by kind of putting them off; right?

**MR. PLUNKETT:**  Yes, it is.

**THE COURT:**  And the problem I have with that is that there was no representation that prevented the University from putting off suit.

He implied *I need more information*, and blah, blah, blah, blah.  It wasn't clear whether he was going to cooperate or not, but there wasn't anything, for instance, that prevented the Government or the University from filing suit precautionarily as a protective matter or from seeking a tolling agreement or a standstill agreement.  There could have been many things the University could have done to protect it's

right in the face of an ambivalent -- a facially ambivalent Mr. Chen.

**MR. PLUNKETT:**  Well, when the factual record is developed, I submit that it will not show that Mr. Chen was, you know, neutral on this.

Mr. Chen was requesting information.  We believe the factual record will show that that resulted in an investigation that took quite a while and then there were further communications.

But we also don't think that the law of equitable estoppel, when this type of conduct is taking place, requires you to file a placeholder suit or requires you to enter into a tolling agreement.  I haven't seen any case to that effect.

In any event, equitable tolling I think is always decided on summary judgment on a full record.

I want to make one point about --

**THE COURT:**  You're the one that's making the estoppel argument --

**MR. PLUNKETT:**  We're the ones making the estoppel --

**THE COURT:**  -- but I think you're conceding that may be a fact question as well I can't decide.

**MR. PLUNKETT:**  That's my point.  I am saying it is a fact question.

**MR. GUNTHER:**  Your Honor --

**MR. PLUNKETT:**  That whether the statute of limitations

has tolled in this case with respect to every claim in every patent is a factual question.

MR. GUNTHER: Your Honor, can I just respond on that one point?

THE COURT: Yeah.

MR. GUNTHER: So if you look at their -- and, again, we're at the pleading stage. If you look at their Amended Complaint, paragraphs 47 and 51, that's where they talk about the allegations with respect to what they say gives rise to equitable estoppel.

And when you look at the equitable estoppel cases, what you find are misrepresentations, active concealment, you know, sort of bad conduct that ultimately leads -- lulls the other person into a sense of, *Hey, I'm -- you know, I don't have to do anything here*; right?

And, Your Honor, if you look at these -- if you look at these allegations that they've laid out in their Amended Complaint, they don't come close to that. They basically -- and Your Honor was right when you said this before. At most what they say is, *Well, you know he was ambivalent.*

Nothing about sort of, you know, being -- sort of making a falsehood or a false statement or hiding something from the University.

And, in fact, Your Honor, if you go back to what they alleged back in paragraph 42 from 2009-2010, he had already

told them -- we assume this is true for purposes of this motion -- he had already told them that he was not going to sign.

So I think, Your Honor, if you look at this -- if you look at what they've pled against -- and I don't think they can plead any more.  That's the important thing, Your Honor.

They've pled.  They've done it.  This is their second chance.  That's the best they can do, and it just doesn't get to the kind of conduct that the cases look at in terms of equitable estoppel.

**THE COURT:**  So what is the misrepresentation?

**MR. PLUNKETT:**  So the representations that were made -- there's at least six different -- I would point Your Honor to paragraphs 42 and then 47, 48, 51, and 53.

There were conversations --

**THE COURT:**  Well, what is 42?  Because it said "at that time," is that the idea?  It's sort of leading them to think that he might do it later?  Is that the misrepresentation when --

**MR. PLUNKETT:**  That's correct.  But, again, that's 2009 and that's 2010, so -- and counsel just mentioned that again; but that would have to be an argument in favor of repudiation, which is contrary to the factual record.

**THE COURT:**  So where is the -- I thought the equitable estoppel conduct is in Roman numeral VI, paragraphs 45

through --

MR. PLUNKETT:  That's right.

THE COURT:  -- 55.

And so I'm looking and I'm trying to see where is there an affirmative misrepresentation --

MR. PLUNKETT:  Okay.  So --

THE COURT:  -- or an act of concealment.

MR. PLUNKETT:  There are specific communications alleged in paragraph 47, 48 --

THE COURT:  Well, 48 he says (reading):

"I do not believe I contributed to material in the claims in this application.  Thus, I do not believe I am an inventor on this application."

How is that a misrepresentation that lulled the University into forbearing suit?

MR. PLUNKETT:  Well, so in that -- maybe that's not a misrepresentation, but that's only one communication.

THE COURT:  Okay.  Well, I'm asking you to point me to something here --

MR. PLUNKETT:  Okay.  So in paragraph --

THE COURT:  -- that lulled the University into --

MR. PLUNKETT:  Okay.  So in paragraph 51, there is a -- in 2014, there's a -- he hires counsel and he requests additional information from the University.

So he's not repudiating his obligations.  He's saying --

and let me just say this:  Mr. Chen is using a gmail address at this point.  Even though he's founded Genia, he's not using his Genia e-mail address.

So under his gmail address, he's hiring counsel and he's telling the University, *I'm not sure if I need to sign these papers.  I need additional information from you.*

And it's at that point that the University, in trying to comply with that request, goes back and looks for information and can't find his lab notebooks, which apparently have been taken.

And then there were more communications that are cited in here, I think it's in paragraph 53, communications among counsel regarding Mr. Chen's obligations in taking several positions in those letters that are inconsistent with repudiation and that do eventually cause the University to realize that Mr. Chen intends to breach his obligation.

So it's no coincidence that this lawsuit is filed later that year after those communications.

THE COURT:  Well, he says in 53 he contended he went outside documents that, quote, "falsely purport to name him as an inventor of the subject matter claimed in such application as of the claimed priority date."

I mean, reading that, doesn't that make his position fairly clear?  Where is the deception there?  I'm not sure.  Maybe I'm missing something.

**MR. PLUNKETT:** Your Honor, so that came later. There were other communications that would put that in context and surely other communications that will come out during discovery.

The --

**THE COURT:** I mean, it seems to me that the closest thing is a September 14th letter saying -- requesting additional factual legal basis for believing that he was an inventor, evidencing -- as if he's still considering it. You know, *Give me more evidence, and I'll consider it.*

And I guess, you know, implicitly you're saying that he knew all along that this was not -- he wasn't going to sign it; and, therefore, he just put off the University and sent them on a wild goose chase to get more documents; and, therefore, they didn't file in September 2014. They waited for some period.

Let me ask your response to that.

**MR. GUNTHER:** Yeah. My response on that, Your Honor, as fairly read starting Complaint, paragraph 41 and going through 55, 2000 -- maybe 2000 -- sorry -- 2009-2010, that's paragraphs 41 and 42, he doesn't sign and he tells them at least on one occasion *I'm not going to sign at this time.*

And then you get to the later conduct from 2000 -- and, you know, they don't do anything for a couple of years. Now they come back to him starting in around late 2013.

And fairly read, Your Honor, what these allegations say is

that he either told them he's not going to -- he doesn't believe he contributed to the material in the claims.  That's the March 5th, 2014, letter, paragraph 48; right?

And then on a couple of occasions he asks for some more information, but he never tells them anything to indicate that he's going to sign.

And, in fact, 2008-2009, *I'm not going to sign*.  March 5, 2014, *I do not believe I contributed to the material in the claims of this application.  I don't believe I'm the inventor.*

And then you get to paragraph 53 that Your Honor pointed to, February 16, "falsely purport to name him as an inventor on the subject matter claimed in such applications..."

**THE COURT:**  Well, how about this?  How about this? This is also after, arguably, constructive notice was given by publication of the '914 --

**MR. GUNTHER:**  Right.  Right.

**THE COURT:**  -- which is published in 2011 after publication of the continued -- first continuation patent which resulted in the '854 published in January of 2013, before his paragraph 51 statement; and, indeed, it is after the continuation patent which became '420, which became published in January of 2014.

So by that point, you know, if you buy the argument that the University should have been on notice had they done some inquiry, combined with all his prior statements that *I'm not*

*going to sign this thing,* his request for additional information --

MR. GUNTHER:  Your Honor, let me just finish the point on that.

You know, we've cited the *Raifman* case on page 5 of our reply brief, and that stands for the proposition -- it's a Northern District of California case -- it stands for the proposition that equitable estoppel is not applicable when the plaintiff is on notice of a potential claim.

MR. PLUNKETT:  Well, can I make a point?

THE COURT:  Wait a minute.  Let him finish.

MR. GUNTHER:  So, Your Honor, here's the thing: You're right.

And one of the things that I think is a little bit extraordinary in this case is all of this stuff is in their Amended Complaint; right?  This is not like, you know, I'm going outside the Complaint.  All of this is laid out, including the acts that give rise to constructive notice.

So I think when you put this all together -- and, Your Honor, I suggest this is their second try.  This is the best they can do.  Equitable estoppel, they don't even come close on it.

MR. PLUNKETT:  I want to make two points.  First of all, throwing all those communications into one bucket conflates things that are unrelated.

The early communications related to abandoned patents. The communication that asked Mr. Chen to sign for the patents that are the subject -- the UCSC patents that are the subject of this dispute occurred in 2014 within the four-year time frame.  So it's within the statutory period for the patent applications that are at issue.

THE COURT:  Equitable estoppel requires some reliance, reasonable reliance.  You have to induce somebody to give up a right, that they acted reasonably in so doing.  There were -- if they acted unreasonably, you don't get the benefit of equitable estoppel.

So although it's a different subject matter, it provides context for what's going on, and I'd like you to answer the question about the fact that there -- that by that time, by the most powerful statement you have -- which is not all that powerful, because all it was, at most, kind of an ambivalent statement -- but let's say that masks his true intent and he was kind of stringing the University along.  He had already filed the '914 and published the '854 application and the '420 with his name on it; right?

MR. PLUNKETT:  So the applications -- are those the early applications?

THE COURT:  Those are the continued -- the Genia patents -- three of the Genia patents.

MR. PLUNKETT:  That's right.  But, again, is the

question about investigation?  Because the claim --

**THE COURT:**  No.  The question is reasonable reliance. You're saying the University reasonably forbore bringing suit earlier because of this conduct, this statement.

And I think the response is:  There was lots of other statements.  And maybe they go to different issues as well, but they sort of inform the overall contents of this statement; and the combination of three patents on the same -- in the same field having been filed by the same author now working, you know, for his own company.

To say that the University had no grounds for filing suit and, therefore, reasonably decided not to file suit in 2014 because of his statement that *Give me more information before I make a final decision*, that's pretty tough.

**MR. PLUNKETT:**  Well, first of all, we think those are all factual questions; but, secondly, with respect to the Genia patents, equitable estoppel -- our allegations with respect to equitable estoppel are only needed with regard to the '914 patent because all of the other patents, there is no law that would make those -- give us constructive knowledge of those other patent applications.

So the equitable estoppel, you know, maybe it will end up being a hard argument to make at summary judgment, but at this stage it's not needed to save any of the claims with respect to those Genia patents.

And I want to make one point of clarification.  Counsel did cite the *Raifman* case in their reply brief for the point he just made, which is that equitable estoppel does not come in to play until the plaintiff is on notice of a potential claim.

That is a misquote of that case.  If you go to that case at page Star 12, it's not talking about equitable estoppel.  It says, and I quote, "The fraudulent concealment doctrine does not come in to play."  That is a different doctrine and not one we allege.

Equitable estoppel applies and creates factual issues when you know about your claim but you forbear bringing it in hopes that you won't have to bring a claim.  So --

THE COURT:  Well, but, no, it has to be induced by something.

MR. PLUNKETT:  And that is a factually -- that is true.

THE COURT:  And other than fraudulent concealment, what else can induce a cognizable equitable estoppel claim?

MR. PLUNKETT:  By saying you're going to lead somebody on, by saying you're going to work it out, by saying -- asking them to investigate, by asking --

THE COURT:  Isn't this the other side of the coin?

MR. PLUNKETT:  It's -- well, the difference I'm talking about is whether it matters because their point is that you have to -- because we supposedly knew about the claim when

the '914 patent published, they're saying you can't have equitable tolling, and I'm pointing out that the case does not talk about equitable estoppel.

THE COURT: All right. Let me -- let me quickly address the federal preemption claim.

Here it seems to me we're not trying to define rights based on inventorship. This is a contract claim. This is a claim based on failure to comply with a contract that requires assignment of rights based on when somebody worked, it seems to me. So I'm not sure how this turns on a determination of inventorship.

MR. GUNTHER: Your Honor, let me say this: There are two types of state law claims in Counts 2 through 8. One are contract based and the others are tort based.

So with respect to the tort-based ones -- and, you know, I think that there are plenty of cases that talk about whether that -- and I think this is true irrespective of tort or contract -- that the cases say you've got to look at the underlying conduct and not so much focused on, you know, the niceties of the claim. And we cited cases to the Court on that.

And, Your Honor, here's the thing that I think is to me the most telling. And it's if you look at their Amended Complaint and you look when they actually get to the allegations supporting it at the back when they're going

through each of the counts and they basically have sort of the charging allegation in each count -- and I'm going to give you a bunch of paragraphs now, Your Honor, but they're almost identical and they all go to whether or not Chen invented at UCSC or whether he invented after he left and went to Genia.

That's paragraphs 89 and 91. Those are for the ownership claim.

Paragraph 102 --

**THE COURT:** Well, let me look at it.

**MR. GUNTHER:** Yeah. I'm sorry.

89 and 91 are the first two.

(Pause in proceedings.)

**MR. GUNTHER:** So if you look at 89 and 91, it's essentially, you know, started the patent applications at the University and then patent applications at Genia.

91, failed to disclose that he assigned his rights to the UCSC inventions to Genia. Genia improperly claims to be the true owner. But that all is derived and based on, Your Honor, issues of inventorship. That's the only thing that underlies that. Because if he invented at Genia and not at the University, none of these things are cognizable.

And that's --

**THE COURT:** Isn't that a question of timing as opposed to who invented, who claims credit, or who was the -- well, the inventor in the common sense of the word?

**MR. GUNTHER:**  I think it's both, Your Honor.  I think -- and I think this is really important.

As they've alleged it in the Complaint, they say not only did he do -- did he do the inventing while he was there, that he was one of the inventors along with the other -- some other folks in that lab; that actually --

**THE COURT:**  At Genia?

**MR. GUNTHER:**  At both.  They say -- their Complaint is that he was doing the inventing while he was at the University; right?  So they're saying that he was an inventor with respect to that.

**THE COURT:**  Well, is that in dispute?

**MR. GUNTHER:**  Oh, absolutely, Your Honor.  Absolutely. Because, look, one of the first claims in this case is a correction of inventorship claim.

And our position is that the work that he ended up doing at Genia is completely different.  It's obviously in the same field, but it's completely different work that he -- that wasn't work that he did when he was in at the University.

So what we're saying, there really is, Your Honor, a huge dispute in this case and it percolates throughout their Amended Complaint about not only when did he invent but where.  Did he invent at the University, or did he invent after he left and cofounded Genia?

**THE COURT:**  Well, that's when.  I mean, there's a

sequence.  When is the where.

**MR. GUNTHER:**  But it also involves what he did -- right? -- because it involves what he did at the University, and it involves what he did when he left and went to Genia.  So it's not -- Your Honor, and I think this is pretty important, it's not just a timing issue.  It's an invention issue.

And one of the things --

**THE COURT:**  And tell me again what the invention nontiming issue is.

**MR. GUNTHER:**  The invention nontiming issue is:  What did he actually do at --

**THE COURT:**  At where?

**MR. GUNTHER:**  Both.  I think it's extremely -- you know, again, in terms of the Complaint:  What did he do at the University?  Right?  What did he -- what work did he actually do; and, ultimately, what did that work mean -- right? -- in terms of patent applications that were later filed?  Right?

And then when he went off and cofounded Genia, what work was he doing there?  Both obviously related generally, Your Honor, to the nanopore space.

But what did he do when he was at Genia?  And is that -- did he take the inventions that he had done -- that he invented, you know, as an inventor at University of California, and take them and use them at Genia and patent them; or did he actually do that inventive work as an inventor when he was at

Genia?  That's what this case is about.

**THE COURT:**  That's a "when" question.

**MR. GUNTHER:**  It's a "when" and a "what"; right?

**THE COURT:**  All right.  Well, what's your response to that?

**MS. FLANNERY:**  And, Your Honor, I'm going to respond to this particular argument, if that's okay.

**THE COURT:**  Yep.

**MS. FLANNERY:**  So I agree with Your Honor that this is a timing issue, but all of these questions that counsel for defendants is raising -- why they did it, did he use this using University facilities, all of that kind of thing -- all of that is about the scope of the patent agreement, the interpretation of the patent agreement, which we know, based on well-established law, is an issue of state law, not federal law.

And so even if there has to be some decision as to whether or not he invented, which, as we pointed out in our briefing, the agreement actually doesn't require that he be an inventor under patent law -- the patent agreement says "conceives or develops" -- so anything he develops, even if he wasn't an inventor, he was obligated to assign to the University.

But even if you assume that there is some sort of invention standard required in the agreement, the interpretation of that is going to be of state law.

And, in fact, in the cases that we've cited in our briefs, the Federal Circuit has found that even if you have an underlying inventorship issue to determine, the underlying state law cause of action for ownership, breach of contract, what-have-you, that's not preempted.  That's specifically made clear in the *American Cyanamid* cases that are cited in our briefing, Your Honor.

(Reporter requests clarification.)

**MS. FLANNERY:**  I'm sorry.  American Cyanamid, C-y-a-n-a-m-i-d.

**THE REPORTER:**  Thank you.  Sorry.

**MS. FLANNERY:**  No.  No problem.

In that case, when it was decided in that contract that the inquiry was whether or not the parties were inventors, the court decided that they had to apply the federal inventorship standard, but the Federal Circuit specifically held that the actual cause of action was not preempted for that reason.  They said the state law -- the State Court will have to apply federal patent law in doing that, but it's an ancillary issue. That doesn't mean there's preemption.  And the Federal Circuit has held that also in the *Dow Chemical* case that's cited in our briefing as well.

So all of this, even if you agree that there has to be some sort of, beyond just timing, inventorship determination, that doesn't result in preemption of our state law claims; and

there is no case the defendants have cited that preempts anything contract based or really anything other than a conversion of a claim.

MR. GUNTHER:  Two seconds.  I'll keep it brief.

And, Your Honor, I just want to state with the patent agreement, which they attached as an exhibit to the Amended Complaint, in terms of whether or not we're talking about federal patent issues here, clearly, Your Honor, the title of it is "State Oath of Allegiance," which, you know, is *I swear my allegiance to California*.  Then it goes on and it has two other parts:  Patent Policy and Patent Acknowledgment.

THE COURT:  What --

MR. GUNTHER:  It's -- I think it's Exhibit A, Your Honor, to the Amended -- to the --

THE COURT:  Yeah.  I have it.  I have Exhibit A.

(Pause in proceedings.)

THE COURT:  No.  Exhibit -- yeah.  Okay.  So where?

MR. GUNTHER:  Do you have that, Your Honor?

THE COURT:  Yeah.

MR. GUNTHER:  So here's the point.  They're sort of saying, *Well, this could be broader than just federal patent law.  It's a state contract.*

And what I'm saying is:  That's clearly not the case when you look at the actual language of this, the headings, "Patent Policy" and "Patent Acknowledgment," Patent Acknowledgment in

the body before it starts talking about what the obligations of the inventor are.

So the notion that there's -- that this can encompass something beyond patents, federal patents, it's just -- there's no way you can look at this and fairly say it's clear on its face it's all about patents and, ultimately, inventorship.

And that's why we say, with respect particularly, Your Honor, with respect to the conversion and other State Court tort claims, that they're clearly embodying inventorship in terms of bringing those things and applying them.

But I would also say, Your Honor, even in this case, because of the particular way this contract is written, it's not a contract that is basically talking about giving rights under state law.  It's talking about rights under federal law, and that makes this contract, I think, different than the kinds of case that --

THE COURT:  All right.  Why don't you tell me where you come up with this divergence from patent law?  Where in this document?

MS. FLANNERY:  Sure, Your Honor.

So two places under the "Patent Acknowledgment" heading.  So we've got -- one, two, three -- four paragraphs down on the left side.

THE COURT:  Yeah.

MS. FLANNERY:  *I acknowledge my obligation to*

*assign*...  And this is the point where I think we're going to have some disagreement as to whether or not this is limited to patents, because this document says "assign inventions and patents."  So at least that part of the agreement suggests both, whether an invention is patentable or not.

So, again, all are going to be fact issues all relegated to state law.

And then we go further in that sentence that I --

**THE COURT:**  Inventions or patents "that I conceive or develop."

**MS. FLANNERY:**  Correct.  And that's the other point of divergence.

**THE COURT:**  And then you say "conceive or develop" is a different standard than inventorship under federal patent law?

**MS. FLANNERY:**  Yes.  And we have also cited federal cases.  So "to develop," that's not anywhere in the federal patent law inventorship standard.

But then we've also cited cases that say "conceived."  The interpretation of that is actually an issue of state law as well.  And it's not the purpose of the federal court to say, "Yes, 'conceive' always means 'invent.'"  We cited cases to Your Honor about that as well.

**THE COURT:**  All right.  You said there's another place here?  Is that the only place, or is there another key?

**MS. FLANNERY:** Those are the key -- those are the key places, Your Honor.

**THE COURT:** All right. Let me just give you a quick response.

**MR. GUNTHER:** Yeah. Yeah.

Your Honor, my point in responding to this is that -- two things. Inventions are patents. That's covering a situation where you already have an issued patent and you're signing this thing, you're going to give it over at that point.

But it's also talking about patents. Remember, this is the Patent Acknowledgment. That's what this is all about; that before if you haven't actually done work that relates to a patent and you make an invention, then you have to assign at that point. It's both. It's patents either pre -- the pre-patent or post-patent.

But the key thing, Your Honor -- and it goes right to the language throughout this document -- is that it's talking about patents. Patent Acknowledgment. Patent Policy. It's not talking about, you know, other stuff.

**THE COURT:** Well, what about "conceive" or "develop"? "Conceive" sounds quite broad.

**MR. GUNTHER:** Well, conceive -- well, again, remember, Your Honor, conception and reduction to practice, those are the two things that you talk about in patent law with respect to invention; right?

And so "conception" is a term of art that goes directly to and supports the notion that this is a Patent Acknowledgment.

THE COURT:  Well, so this raises an interesting question.  Arguably, the question of whether or not this aligns and fully incorporates patent law, which makes it then look like more of a preemptive situation, turns on contract interpretation because it's a matter of state law.

So what happens?  We go part way through the case, you render an interpretation; and if I render an interpretation that aligns with federal law, suddenly there's a preemption and the case gets lifted away?  Or what would happen during trial?  How do you -- what's the case management approach to this?

MR. GUNTHER:  I think --

MS. FLANNERY:  So --

MR. GUNTHER:  Look, Your Honor, here's one thing I would suggest with respect to the preemption issue.  It feels to me like one way to skin the cat on this, if Your Honor isn't comfortable just looking at the language, would be to actually -- you know, the Court -- see if the Court can construe this as a matter of law.

I mean --

THE COURT:  Contract claim construction.  I've got contract construction -- claim construction.

MR. GUNTHER:  That's right.  But, Your Honor, I think it's an interesting question.  It's a very good question.

But one of the things that, you know, you typically will do with respect to an instrument like this is that, unless there's an ambiguity, it's for the Court -- right? -- to make that determination.

So I would think, Your Honor, the worst situation of all for all of us, including Your Honor, is that we get into a jury trial and all of a sudden it's sort of like, okay, they've found that it's --

**THE COURT:** To add an extra twist, my recollection of California contract law is that whether or not there's an ambiguity or not, even if something appears to be patently unambiguous, you can introduce parol evidence to determine whether or not it's ambiguous; and then if it's ambiguous, then you can admit parol evidence not inconsistent.

And then in that case, what do we have? Like a mini-trial? Maybe it is. Maybe there's a mini-trial construing the contract to determine whether or not there's a preemption problem or not. I'd have to think about that.

**MR. GUNTHER:** Well, I mean, I think what I would say on this, Your Honor, I think that that would certainly be a fallback from my position -- from my perspective.

I do think that, from my perspective -- and this is my position on it -- is that one can look at this document and draw from it very clearly that it is all about federal patents. That's my position.

If Your Honor disagrees with me on that, then I think, you know, we'd have -- I think you're right, we'd have to think about how to do this in a way that makes sense and is efficient; but I would respectfully suggest that you don't have to get there.

**MS. FLANNERY:**  And, Your Honor --

**THE COURT:**  Let me ask you.  If this is construed to sort of incorporate by reference patent inventorship law into this obligation, what would your position be, then, about preemption?

**MS. FLANNERY:**  My position would be it's still not preempted, and that is because of the *American Cyanamid* and *Dow Chemical* cases -- both Federal Circuit cases cited in our brief -- saying that even if you have an issue of federal -- even if the scope of the agreement is defined based on an inventorship standard that is defined under federal law, that does not result in the preemption of the underlying cause of action because the cause of action is not seeking patent-like rights.  They're not trying to enforce the patent -- you know, patent infringement against someone else.  They're trying to declare ownership.

And the Federal Circuit has said again and again that ownership of patents is a matter of state law.  And so I would submit that under those cases, even if Your Honor goes through this, you know, exercise of construing the contract as a matter

of law and comes to the conclusion that it means inventorship under patent law, the Federal Circuit has already --

**THE COURT:**  Was there not -- I'm trying to recall. Was there not a case that said in the context of malpractice, legal malpractice, where somebody mishandled a patent prosecution or patent licensing, or something, and then that to determine whether or not there was a cause -- or damages, one actually had to look in construing the patent and actually go through a mini-patent trial?

I know I ruled one way and I reversed myself, but I can't remember which one it was.

Is there Federal Circuit law?  I mean, maybe that's not the same.  It seems a little bit analogous; that is, where you have a patent issue wrapped up in a cocoon of state law, one could argue that ultimately it's a state law question whether it's malpractice or not.

But I thought the court held that if you really have to get down to actually construing the patent, which is a work of the Federal Court, that federalizes that and then preemption applies.  Is there some case or not?

**MR. GUNTHER:**  I think the kind of cases you're thinking of -- because they come up in a couple of flavors -- one is a straight -- is a real preemption situation and then others are does it raise a federal cause of action as opposed to a state cause of action.  Right?

**MR. MORICO:** State right.

**MR. GUNTHER:** Sometimes they come up in remand context, that kind of thing, Your Honor. And I'll concede it can be a little tricky.

Two things on this. The Federal Circuit has been very clear that it's -- the underlying conduct that's at issue with respect to the claim is inventorship, it's preempted.

And the particular claims that were at issue in the *Cyanamid* case -- I can't say it either. I'm sorry -- is that -- are claims that aren't at issue in this case. They were fraudulent concealment claims, which are not at issue in this case, and unjust enrichment. They're just different.

**THE COURT:** All right. Let me briefly -- that's helpful. Let me think about that.

Let me briefly address the scope of the Patent Agreement and, I guess, the question about being bound, quote, "during any period of employment by the University for any period during which I conceived or developed any invention during the course of my utilization of University research facilities."

I'm not sure I understand. I guess the theory is that once employment ends and the use of facility ends, even if the invention were developed during the period of employment, that then Mr. Chen is free to do anything he wants?

**MR. GUNTHER:** Your Honor, that's what this language says.

And, you know, look, this is one of those ones where you sort of say to yourself and -- and, look, they put it in their brief.  How could this be?  Thousands of people have signed these agreements, you know.

But then you look at it, Your Honor, and we've looked at it very carefully, and it basically says just what we put in our brief, which is *I'm bound during my employment and during the time I'm using their work.*

And it doesn't limit it.  It's at the end -- it's at the very end of the Agreement, so it's obviously referring -- it's sort of a sum-up.

And, Your Honor, I would say -- and, you know, this is not a new form.  I mean, the fact that it has people giving it an Oath of Allegiance to the State of California, it seems to me to be coming from a little bit of an earlier time.

But the fact of the matter is, Your Honor, whether it's new or old, they wrote the contract.  It's an adhesion contract.  Our guys didn't get up -- Mr. Chen didn't have any ability to negotiate this.  He didn't have anything to do with it.  When you read that language, Your Honor, that's what it says.

**THE COURT:**  Okay.

**MR. PLUNKETT:**  Well, our argument was not:  How could this be?  We explained exactly what this language meant.  It indicates that Mr. Chen's obligations to assign inventions to

the University -- it indicates when his obligations attach, not when he must comply with the University's request to obtain patent protection.

And the reason for the language is because it complies with the California Labor Code, which makes clear that inventions that are not made during employment or while using the employer's resources are not subject to an assignment clause.

So that's why the language makes sense.  That's why it's in there.  But, in any event, a clean interpretation of this means that he is bound in terms of when his obligations attach during any periods of employment.

It certainly does not mean and cannot be interpreted to mean that any employee can use California public university facilities, research facilities, and then after they've invented something, they can quit and they have no further obligations.

**THE COURT:**  Well, and going back to the earlier language we talked about for the last section, it does say on the left side (reading):

"I acknowledge my obligations to assign inventions and patents that I concede were developed while employed by the University or during the course of my utilization of assets and research facilities."

I mean, it wouldn't mean anything if you say, *Well, that*

*obligation to assign ends upon leaving.*

MR. MORICO:  That's our point.

THE COURT:  And so it ignores the left side of the --
I mean, it just -- you know, it just doesn't --

MR. GUNTHER:  And, look, Your Honor, I would argue
that the left side is totally consistent with the right side.
They both say that this was when your obligation to assign
occurs and this is when you are bound.  I think that they work
together.  I'll be honest with you, I don't think that they're
in tension with each other.

THE COURT:  Now, that is a contract construction0
question, and I guess the question is:  Is that a matter of law
at this point, or is that something that has sufficient
ambiguity that the door is open to parol evidence and other
consideration; and then, therefore, it's either a factual
question or a court has to decide?

I've always wondered about this because there's some law
that says courts aren't to construe contracts, and I'm not sure
if that means even when there is parol evidence.

In any event --

MR. PLUNKETT:  Well, the contract certainly doesn't
have the level of clarity that it could be decided as a matter
of law in defendants' favor.  Perhaps it could be decided as a
matter of law that it does not mean what they say.

THE COURT:  It's hard to have it both ways.  It's

either ambiguous --

(Simultaneous colloquy.)

**THE COURT:**  It seems to me that on its face our conversation makes it clear that there's some ambiguity here and it needs construction.  And I guess I'd have to think about whether there is something that can be construed now by the bench without any other extrinsic or parol evidence; or whether that's something that, again as a case management or procedural matter, must await a second stage whatever that maybe.

So I'm going to take this under submission.  It's all very interesting.  There may be some cutting-edge issues here, but it's enough that I do want to look at the cases and look at the --

**MR. GUNTHER:**  Your Honor, thanks for giving us an opportunity to argue it.

**THE COURT:**  I appreciate your patience.

Let me ask you from, again, a case management perspective. And I did appreciate your filing a case management statement. And I'm a little bit reluctant to set discovery dates, et cetera, without knowing exactly -- and you'll want to know -- what the scope is, and seems like we should probably settle pleadings before we get too deep into the -- I mean, there's -- you know, into this.

I do want to ask, though, about ADR.  You've agreed -- it looks like you've agreed to private ADR?

**MR. GUNTHER:**  Yes, Your Honor.

**MR. MORICO:**  That's correct, Your Honor.

**THE COURT:**  What's the timing?  How far along are you in that?

**MR. GUNTHER:**  Well, I think, Your Honor, as I understand it, the agreement is that we think it makes sense to get a decision on the courts -- from the court on the motion to dismiss in the first instance.

**THE COURT:**  Yep.

**MR. GUNTHER:**  And I think that at least our feeling was -- and I think the feeling is shared by the other side -- is that would help dictate should we do it -- do we need some discovery; can we do it, you know, pretty quickly.

**THE COURT:**  Yeah.  Sure.

**MR. GUNTHER:**  And so I think from our perspective we want to see how the motion comes out.  Then I think meet and confer to try to figure out what makes most sense.

**THE COURT:**  Do you agree with that?

**MR. MORICO:**  We do, Your Honor.  We're of the view that it happen before the end of any discovery period that may exist in this case and certainly after Your Honor's ruling.

**THE COURT:**  Right.  Well, I'm hoping on the early side.  I mean, I certainly understand you've got to see what the scope of this case is and where it's going and how we're going to lay this case out.

I'm hoping we don't have to get through full-bore discovery before you go to some form of mediation, but why don't we reserve that until the next case management conference, which I would like to do once we sort of -- I have a chance to rule on this and to the extent I dismiss and there's some leave to amend and give you a chance to amend. I don't know exactly when that will be -- hopefully soon -- but why don't we just, for control date purposes, set a CMC out for 60 days, Betty.

THE CLERK: August 10th at 10:30.

THE COURT: And we may have to move that or if there's a further motion, I can collapse it with that.

MR. MORICO: Your Honor, if I may, is there any chance we could move that by a few days? I'm going to be overseas during that time.

THE CLERK: August 17th, the following week, at 10:30.

MR. MORICO: That would work. Thank you very much.

THE COURT: All right. And, again, that may change depending on certain things, but first order at hand is to now wrestle with these very interesting questions and I'll get out an order as quickly as I can.

MR. GUNTHER: Thank you very much, Your Honor.

MR. MORICO: Thank you, Your Honor.

(Proceedings adjourned at 4:20 p.m.)

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript to the best of my ability of the above pages of the stenographic notes of Official Court Reporter, Lydia Zinn, CSR No. 9223, provided to me by the U.S. District Court for the Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

DATE:   Friday, June 16, 2017

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter/Transcriber